**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                  - against -

JOHN A. BURKE, et al,
                              Defendants.
----------------------------------------------------------X

**REPORT AND RECOMMENDATION**
CR 09-0135 (SJ) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

       Defendant James Cadicamo ("Cadicamo") seeks to suppress a firearm recovered from his residence at the time of his arrest as well as statements made to federal agents and his wife, respectively, while he was in custody. Docket Entry ("DE") 18-1. The Honorable Sterling Johnson, Jr., United States District Judge, referred the motion to suppress to me for a report and recommendation. DE 23. I now make my report and, for the reasons discussed below, respectfully recommend that the court deny Cadicamo's motion. Briefly stated, the motion to suppress Cadicamo's statements to the agents is moot because the government will not offer such evidence, Cadicamo gave valid consent to the search of his home and made voluntary statements that resulted in the seizure of the firearm, and he waived the spousal communications privilege by speaking to his wife on a telephone that he knew to be monitored by the detention facility in which he was lodged.

I.    <u>Background</u>

    A.    <u>Procedural History</u>

       Cadicamo originally filed the instant motion on September 18, 2008, in the United States District Court of the Middle District of Florida, where the case was then pending. DE 18-1 (including Notice of Motion, Memorandum of Law, and Affidavit of James V. Cadicamo). The

government filed a responsive brief in that court on October 13, 2008, and, after the case was transferred to this district, supplemented that response with a letter dated April 20, 2009. DE 18-2; DE 18. I held an evidentiary hearing on August 14, 2009. DE 44 (minute entry). Cadicamo offered no evidence beyond the affidavit he had already submitted, and he declined to allow the government to cross-examine him on the factual assertions made in that affidavit. The government presented the evidence of a single witness, Federal Bureau of Investigation ("FBI") Special Agent Timothy Gorman ("Gorman"). *See generally* DE 56 (hearing transcript dated August 14, 2009) ("Tr."). At my direction, Cadicamo filed a post-hearing letter-brief on August 25, 2009, and the government responded on October 2, 2009. DE 45; DE 54.

B.  Facts

Having reviewed the entire evidentiary record, I find the facts to be as follows. In making my factual findings, I credit Agent Gorman's testimony in its entirety, and give no weight to any of Cadicamo's contrary assertions – not simply because he did not testify in person, but rather because his refusal to subject his written statements to adversarial testing left me with no reason to credit those assertions over the wholly credible live testimony that Gorman gave in response to both the government's direct examination and Cadicamo's cross-examination. *See, e.g., United States v. Rodriguez*, 1993 WL 78060, at *2 (S.D.N.Y. Mar. 16, 1993) (weighing the fact that defendant affiant did not testify negatively in assessing the defendant's credibility).

At 5:30 or 6:00 a.m. on August 5, 2008, approximately fifteen law enforcement officers arrived at Cadicamo's home to execute a warrant for his arrest. After arriving at Cadicamo's home, FBI Special Agent Ortiz ("Ortiz") contacted Cadicamo by telephone to inform him that law enforcement authorities were stationed outside his home with the intention of arresting him.

2

Cadicamo responded that he was not at his residence but was en route to his home and would arrive momentarily. Over the course of several telephone conversations, Ortiz told Cadicamo to remain where he was and Cadicamo refused. Concerned about Cadicamo's failure to comply, the FBI agents decided to enter Cadicamo's residence to conduct a "sweep" of the home to confirm that Cadicamo was not in fact in the residence. The agents entered the house, quickly determined that Cadicamo was not there, and left. Cadicamo does not contest in this motion the lawfulness of that entry. Tr. at 29-36, 51.

Cadicamo arrived in his car a short time later. Several agents stopped Cadicamo while his car was a short distance from the house and handcuffed him. Special Agent Michael Brown ("Brown") escorted Cadicamo from his car to his home while restraining his arms, in handcuffs, behind his back. It was there that Gorman encountered Cadicamo and questioned him. Tr. at 32-35, 55.

The government appears to concede that Cadicamo was not warned of his *Miranda* rights before Gorman questioned him. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). At a minimum, it has presented no evidence that Cadicamo was so warned: Gorman, the government's sole witness, did not provide such warnings himself before questioning Cadicamo, and did not know if Ortiz or Brown had done so. Tr. at 40.

Gorman's questions to Cadicamo concerned a gun. Before setting out to arrest Cadicamo, consistent with FBI practice, Gorman had attended an operational briefing. He learned information about Cadicamo's criminal history and that Cadicamo allegedly possessed a gun. Accordingly, when Cadicamo arrived at the front of his home, Gorman asked Cadicamo about the gun's location. Tr. at 64-66. Gorman was unsure about the specific words he used, but

3

described his statement to Cadicamo as being, in essence, "Where's the gun? I [or "we"] want the gun." *Id.* at 35-36. Any uncertainty about the precise phrasing of his inquiry is immaterial to my analysis of the motion.

Cadicamo responded that he did not know the location of the gun. Gorman persisted, and asked five or six questions about the gun's location – such as whether it might be in Cadicamo's home or office, or with Cadicamo's wife – the exact phrasing of which he could not recall. At some point during this questioning, Cadicamo told Gorman, "I don't want anybody to go in my house." Gorman explained that the agents were only interested in the gun and did not wish to conduct a general search. In addition, Gorman explained that Cadicamo could accompany the agents into his home and direct them to the location of the gun. Gorman further told Cadicamo, "You can come in with us, show us where the gun is. We'll get the gun and get out." Cadicamo agreed to that proposal. Tr. at 58. Gorman estimated that his exchange with Cadicamo lasted approximately one to two minutes, and he described its tone as "businesslike" and "polite." Tr. at 68, 69. Neither he nor any other agent had a gun drawn during this exchange.[1]

With his hands still cuffed behind his back, Cadicamo entered the house along with Gorman, Brown, and Special Agent Shannon Muldrow. Cadicamo led the agents to a bedroom, and directed them to search two night stands. After the agents searched both night stands without finding a gun, Cadicamo directed them to a nearby pile of clothes. It was there that the agents discovered and seized the gun that Cadicamo now seeks to suppress. As far as Gorman was

---

[1] Because Gorman did not participate in the initial encounter with Cadicamo, he was unable to say whether any officer had drawn a gun on Cadicamo before Cadicamo was handcuffed. *See* Tr. at 68, 78. In light of Gorman's credible testimony about the content and tone of his conversation with Cadicamo, I conclude that the matter is of no moment to my analysis of the motion.

aware, neither he nor any other agent warned Cadicamo of his *Miranda* rights at any time during these events. Tr. at 41, 55-56, 71-72.

Later that day, while incarcerated at the Pinellas County Jail, Cadicamo spoke with his wife by telephone and made certain statements that Cadicamo now seeks to suppress. Pursuant to the jail's policy and routine practice, jail employees recorded the conversation. There is no dispute that at the time of the conversation, Cadicamo was aware of the practice and knew that his statements were being recorded. Tr. at 19-20.

## II. Discussion

### A. The Statements To Agent Gorman

The government does not intend to offer in evidence Cadicamo's statements to Gorman relating to the location of the firearm. *Id.* at 13, 91; DE 54 at 5-6. Cadicamo's motion to suppress such statements is therefore moot and should be denied for that reason. However, should the government reconsider its position and offer the statements as evidence-in-chief, I respectfully recommend that the court should suppress them on the ground that Cadicamo made the statements in response to Gorman's custodial interrogation despite the fact that he had not been warned of his rights. *See Miranda*, 384 U.S. at 444; *United States v. Rommy,* 506 F.3d 108, 131-32 (2d Cir. 2007).

### B. The Gun

Cadicamo argues that the court should suppress the gun found in his bedroom for two reasons. First, he contends that his consent to the agents' search was not freely given. DE 45 at 3-4. Second, Cadicamo asserts that the admission of the gun would violate his Fifth Amendment privilege against self-incrimination on the ground that the agents only discovered the gun as the

result of statements that Gorman elicited from him through custodial interrogation without the benefit of *Miranda* warnings. *Id.* at 10-11. I address each argument in turn.

1. The Fourth Amendment Claim

The Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV. A party seeking to suppress evidence obtained in violation of that guarantee bears the burden of establishing that a government official acted without a warrant and subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981). Once the movant does so, it becomes the government's obligation to prove by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. *Id.*; *see also United States v. Shamsideen*, 2004 WL 1179304, *2 (S.D.N.Y. May 3, 2004) (shifting the burden of persuasion to the government).

The government contends that its warrantless search of Cadicamo's residence was lawful because Cadicamo consented to it. It therefore bears the burden of proving that Cadicamo's consent was "freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Such consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority. *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (internal citations omitted). The government must prove consent by a preponderance of the evidence. *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983).

Whether a consent to search was voluntary or was the product of duress or coercion is a factual determination in which the totality of the circumstances is considered. *Schneckloth*, 412

U.S. at 227. In this circuit, "the test is an objective one – whether the agents had a reasonable basis for believing that there was valid consent to the search." *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (citing *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)). In assessing whether there was such a reasonable basis, a court should consider the defendant's age, education, intelligence, length of detention, the government's use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights. *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986) (internal quotations omitted). Additional relevant factors include whether consent was obtained from a suspect in custody, whether guns were drawn, whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent. *Id.* at 243-44. Moreover, consent obtained from a person in custody requires more careful scrutiny. *Id.* at 243.

Crediting Gorman's testimony that the questioning lasted one to two minutes, was conducted in a "businesslike" and "polite" manner, included a specific limitation on the scope of the search, and did not involve the use of threats, I conclude based on the totality of the circumstances that the government did not obtain Cadicamo's consent for the search of his home through coercion.² Other courts have found no coercion in factual circumstances similar to those present here. *See, e.g., United States v. Gray,* 283 Fed. Appx. 871, 873 (2d Cir. 2008) (holding that defendant's consent was not coerced because the tone of the encounter was "calm, cooperative, conversation, and relaxed," despite a forced entry by several officers); *United States*

---

² The fact that Cadicamo had previously been arrested, *see* DE 18-2 at 2 & n.1, and was likely aware of his rights despite the lack of *Miranda* warnings, *see Dickerson v. United States*, 530 U.S. 428, 430 (2000) (observing that "the warnings have become part of our national culture"), bolsters my conclusion that the government did not obtain Cadicamo's consent through coercion. However, I do not rely on any such assumption in reaching that conclusion.

*v. Ansaldi*, 372 F.3d 118, 129-30 (2d Cir. 2004) (finding defendant consented to search even though, prior to consent, he was arrested by five or six officers with guns drawn, and was placed in handcuffs).

        2.        <u>The Fifth Amendment Claim</u>

As an alternative to his claim that the search of his home violated his rights under the Fourth Amendment, Cadicamo argues that the gun must be suppressed because the agents found and seized it only as the result of a violation of his Fifth Amendment right not to be compelled to incriminate himself. That argument is foreclosed by the Supreme Court's decision that the Self-Incrimination Clause "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements[,]" in *United States v. Patane*, 542 U.S. 630, 637 (2004) (Thomas, J., plurality opinion);[3] *see also United States v. Haygood*, 157 Fed. Appx. 448, 449 (2d Cir. 2005).

The facts of *Patane* are strikingly similar to those of this case. The police officers who arrested Patane at his home had begun to warn him of his rights when Patane interrupted them and said that he knew his rights. The officers made no further attempt to complete the *Miranda* warnings and the government conceded that Patane's subsequent responses to the officers' questions at the site of the arrest were inadmissible under *Miranda*. Those questions concerned whether Patane was unlawfully in possession of a gun.

> [Patane] was initially reluctant to discuss the matter, stating: 'I am not sure I should tell you anything about the Glock because I don't want you to take it away

---

[3] The three Justices in the plurality in *Patane* were joined in the result by two concurring Justices who opined that the nontestimonial physical fruits of an unwarned statement should be admissible regardless of the voluntariness of the underlying statements so long as the latter are not introduced at trial. *See id*. at 645 (Kennedy, J., concurring).

8

>       from me.' ... Detective Benner persisted, and respondent told him that the pistol
>       was in his bedroom. [Patane] then gave Detective Benner permission to retrieve
>       the pistol. Detective Benner found the pistol and seized it.

542 U.S. at 635.

Cadicamo suggests that *Patane* is distinguishable on the ground that the officers in that case were attempting to warn the arrestee of his rights, in contrast to Agent Gorman who, in Cadicamo's view, committed an "intentional" *Miranda* violation. DE 45 at 11. I disagree that the agent's subjective intent is relevant. An intention to violate an arrestee's Fifth Amendment right would be pertinent only to the extent that the *Miranda* rule was originally designed as a prophylactic measure that would deter police misconduct – but both the plurality and the concurrence in *Patane* agreed that extending the exclusionary rule of *Miranda* to physical evidence seized as a result of an unwarned statement was not necessary for deterrence purposes. *See* 542 U.S. at 639-40 ("[s]uch a blanket suppression rule could not be justified ... by any deterrence rationale") (plurality opinion), 645 ("it is doubtful that exclusion can be justified by a deterrence rationale") (concurrence). Indeed, the plurality opinion explicitly declined to draw a distinction between "negligent" and "deliberate failures to provide [a] suspect with the full panoply of warnings prescribed by *Miranda*." *Id*. at 641.

While Cadicamo's focus on Gorman's subjective intent is therefore misplaced, I agree that the opinion in *Patane* does not necessarily compel the conclusion that physical evidence obtained as the result of a *Miranda* violation is never subject to suppression.[4] Rather than distinguishing *Patane* on the basis of Gorman's subjective intent, however, the focus should be on whether

---

[4] *But see United States v. Sasson*, 334 F. Supp. 2d 347, 358-68 (E.D.N.Y. 2004) (opining in dicta that there is no basis, as a matter of history or policy, for applying the fruit-of-the-poisonous-tree doctrine to violations of the Self-Incrimination Clause).

Cadicamo's statement was subjectively voluntary notwithstanding the *Miranda* violation. In *Patane*, Justice Kennedy wrote (on behalf of himself and Justice O'Connor) that he found it "unnecessary to decide whether the detective's failure to give Patane the full *Miranda* warnings should be characterized as a violation of the *Miranda* rule itself ... so long as the unwarned statements are not later introduced at trial." 542 U.S. at 645. In contrast, the three other Justices who voted with the majority in *Patane* relied on the more precise fact that Patane's statement, although unwarned, was voluntary. *See*, *e.g.*, *id*. at 642 ("There is, with respect to mere failures to warn, nothing to deter"), 643 ("police cannot violate the Self-Incrimination Clause by taking unwarned though voluntary statements").

The question thus becomes whether Cadicamo's statements to Agent Gorman and his colleagues, although made without the benefit of *Miranda* warnings, were voluntary. To the Supreme Court that wrote the *Miranda* decision itself, such a question would have been a *non sequitur*: it "concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. In more recent decisions, however, the Court has retreated not only from adhering to that aspect of *Miranda*, but even from acknowledging its existence. Thus, for example, in *Patane*, the plurality characterized the *Miranda* Court as having concluded only "that the *possibility* of coercion inherent in custodial interrogations unacceptably *raises the risk* that a suspect's privilege against self-incrimination *might* be violated." 542 U.S. at 639 (emphasis added) (citing but not quoting *Miranda*, 384 U.S. at 467); *accord Dickerson*, 530 U.S. at 434-35 (characterizing the *Miranda* Court as having recognized only that custodial

10

interrogation "heightens the risk" of compulsion). As a result, the question of whether Cadicamo's unwarned statements to Agent Gorman were voluntary, which would have been presumptively decided against the government under *Miranda* itself, is after *Patane* a factual matter that the court must determine in deciding whether to suppress the gun that those statements helped Gorman to find.

If compulsion cannot be presumed based on the fact that Cadicamo was subjected to custodial interrogation without the benefit of warnings about his constitutional rights, the evidentiary record compels the conclusion that the statements at issue here were voluntary. Gorman was polite and professional in his brief exchange with Cadicamo, and neither he nor any other agent was brandishing a weapon during their conversation. Moreover, despite the pressures inherent in custodial interrogation, Cadicamo withheld his consent to a general search of his home, and did not allow the agents to enter it until he had extracted limitations on their search that met with his approval: the agents agreed to look for and retrieve only one specific item and then leave, and they agreed to have Cadicamo himself accompany them during their search. Under such circumstances, I conclude that the agents did not overbear Cadicamo's free will, but instead respected it and obtained a voluntary statement about the gun's location that Cadicamo provided only upon being satisfied that his wishes were in other respects going to be honored. As a result, there is no principled reason to distinguish this case from *Patane*, and I therefore respectfully recommend that the court deny the motion to suppress the gun.

    C.    <u>The Statements To Cadicamo's Spouse</u>

The spousal communications privilege generally shields "communications made in confidence during a valid marriage...." *In re Witness before Grand Jury*, 791 F.2d 234, 237 (2d

Cir. 1986). Conversations between spouses are presumed confidential, and the government bears the burden of defeating this presumption by showing that the communication was not made privately. *United States v. Taylor,* 92 F.3d 1313, 1332 (2d Cir. 1996). Although the case law of this circuit has not explicitly addressed the question of whether a detainee's knowing use of detention facility's monitored telephone to speak with his wife necessarily waives the spousal communications privilege, the law is clear that "[p]risoners have no reasonable expectation of privacy in their calls to nonattorneys on institutional telephones." *United States v. Willoughby*, 860 F.2d 15, 20 (2d Cir. 1988). Moreover, courts of other jurisdictions have addressed the issue presented here, and have found a waiver in the essential circumstances of this case. *See*, *e.g.*, *United States v. Madoch,* 149 F.3d 596, 602 (7th Cir. 1998); *United States v. Harrelson*, 754 F.2d 1153, 1169-70 (5th Cir. 1985); *United States v. Griggs*, 2004 WL 2676474, at *4 (S.D.N.Y. Nov. 23, 2004); *see also United States v. Griffin*, 440 F.3d 1138, 1144 (9th Cir. 2006) (spousal communications privilege does not protect from disclosure letters sent by criminal defendant while incarcerated to his wife). I respectfully recommend that the court adopt the reasoning of such decisions and find that Cadicamo waived the spousal communications privilege when he made statements to his wife that he knew his jailer was monitoring and recording. As a result, I respectfully recommend that the court deny the motion to suppress the statements to Cadicamo's spouse.

III.   Recommendation

For the reasons set forth above, I respectfully recommend that the court deny in its entirety defendant James Cadicamo's motion to suppress evidence.

IV.     Objections

Any objections to this Report and Recommendation must be filed no later than November 2, 2009. Failure to file objections within that period will waive the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2).

**SO ORDERED.**

Dated: Brooklyn, New York
October 16, 2009

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge